IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

| | |
|---|---|
| TERRI HANCOCK,<br><br>      Plaintiff,<br><br>vs.<br><br>METROPOLITAN LIFE INSURANCE COMPANY,<br><br>      Defendant. | MEMORANDUM DECISION AND ORDER<br><br>Case No. 2:06-CV-00882DAK<br><br>Judge Dale A. Kimball |

There are three matters before the court. First, Plaintiff Terri Hancock moves for partial summary judgment as to the appropriate standard of review to apply in examining Defendant Metropolitan Life Insurance Company's (MetLife) decision to deny accidental death insurance benefits. Second, MetLife moves for a bench trial on the papers. Finally, Hancock moves for full summary judgment. The court held a hearing on the motions on June 19, 2008. At the hearing, Marcie E. Schaap represented Hancock and Jack M. Englert Jr. and James L. Barnett represented MetLife. Following the hearing, the court took the three motions under advisement. Now, having carefully considered the parties' oral arguments, the memoranda and additional materials submitted by the parties, and the relevant law and facts relating to the motions, the court renders the following Memorandum Decision and Order.

# BACKGROUND

On November 18, 2004, Hancock became concerned when she was unable to reach her mother Verla Dean Hancock (V.D. Hancock) by telephone and decided to check in on her mother at home. When she arrived at V.D. Hancock's home, Hancock found the front door of the house partially open and she heard one of her mother's dogs barking behind the closed bathroom door. Hancock opened the bathroom door to discover her mother lying on the bathroom floor with her head under the toilet. V.D. Hancock was dead. The state medical examiner estimated that V.D. Hancock had died five days earlier, on November 13, 2004.

Officer Wells arrived first at V.D. Hancock's home. In his police report, Officer Wells stated that when he found V.D. Hancock, she

> was lying on the floor with her head under the toilet. Her pants were pulled down and there was what appeared to be feces on the floor and also on her back, staining her shirt. There was a shower chair in the bathroom that had been knocked over and one leg of it was lying across the right side of her face and there was an open storage container that was lying next to her body with misc[ellaneous] items scattered around the floor. There was also a prescription bottle of what was later identified as Oxycontin next to her right hand. It appeared to have fallen out of the storage container.

Hancock also informed Officer Wells that her mother had "type two diabetes, sleep apnea, pulmonary hypertension, high blood pressure, and took Lipitor." V.D. Hancock also apparently suffered from neuropathy resulting from nerve damage in her lower back that caused foot drop, problems with depth perception, and dizziness. She had fallen in her home on prior occasions. Officer Wells and other investigating officers found a number of prescriptions in the house. Officer Wells's report stated that the bottle of Oxycontin that was located next to V.D.

2

Hancock's right hand had been filled one day before her death. The prescription was for sixty tablets. There were only forty pills remaining.

Detective Frank Johnson also conducted an investigation. Hancock told Detective Johnson that V.D. Hancock suffered from "chronic pain in her back and legs"; that her mother had become "addicted to pain medication such as Percocet, Oxycontin, Lortab, etc."; and that "in August 2003, she found [V.D. Hancock] unconscious" due to an "overdose[] on Oxycontin and Lortab." Hancock stated that she did not know whether the overdose was an attempted suicide or an accidental overdose. Hancock noted that at the time of her mother's death, her mother had just begun a drug abuse rehabilitation program and had suffered some depression due to her inability to work, her finances, and her health.

Dr. Todd C. Grey, Utah Chief Medical Examiner, performed an autopsy on V.D. Hancock, determining that there were "no anatomic or toxicological abnormalities sufficient to explain death," nor any evidence of hemorrhaging in V.D. Hancock's head or injuries to her neck, face, scalp, or head. In his report of examination, Dr. Grey stated

> This 61[-]year[-old] white female, [V.D.] Hancock, died as a result of undetermined causes. . . . No evidence of natural disease, injury or intoxication sufficient to explain death is found at autopsy. [V.D. Hancock] had a history of prescription narcotic misuse and findings at the scene were highly suggestive of death due to an overdose of Oxycontin. However, toxicologic testing reveals no evidence of excessive amounts of Oxycontin or other intoxicants.

V.D. Hancock's death certificate listed her cause of death as "undetermined."

At the time of her death, V.D. Hancock was a registered nurse and a participant in the Intermountain Health Care Life Insurance Plan (the Plan), a fully insured ERISA plan underwritten by MetLife. MetLife was the claim administrator for the Plan, and the Plan

accorded MetLife "discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan."

Among other benefits, the Plan provided for accidental death benefits. For a beneficiary to receive accidental death benefits under the Plan, the Plan participant must have died as a result of the accident. Specifically, the Plan required that the accident must have been the sole cause of the injury, the injury the sole cause of the covered loss, and the covered loss must have occurred no later than one year after the date of the accident.

Hancock was a beneficiary under the Plan, and after her mother's passing, Hancock submitted claims under the Plan for the basic life insurance benefit, the optional life insurance benefit, and the accidental death benefit. MetLife approved Hancock's claims for the basic life insurance benefit of $50,000 and the optional life insurance benefit of $75,000. But in a letter dated March 22, 2005, the company informed Hancock that it was denying the accidental death benefit of $200,000 because the evidence in the administrative record did not demonstrate that V.D. Hancock's death was accidental.

In its letter, MetLife informed Hancock of her right to appeal, and on May 19, 2005, Hancock sent MetLife a letter appealing the accidental death benefit denial decision. In her appeal, Hancock argued that the death certificate, the autopsy report, and the police report did "not rule out the possibility of an accidental death." Hancock stated that she had spoken to Detective Johnson and that he had reportedly agreed that it looked like V.D. Hancock had slipped, fallen, and hit her head. Hancock did not provide a written statement from Detective Johnson. In her appeal, Hancock also stated that she had spoken with Dr. Grey, and he had agreed that V.D. Hancock could have struck her head without fracturing her skull and that

advanced decomposition of the brain could have prevented the discovery of a brain injury. Hancock did not submit a written statement from Dr. Grey, and Dr. Grey did not amend the government report to further address V.D. Hancock's cause of death.

On September 1, 2005, MetLife sent a letter to Hancock, informing her that the company was denying her appeal because there was no evidentiary support for Hancock's accidental death theory. In this letter, MetLife explained that "all theories about the cause of [V.D. Hancock's] death are conjecture; they do not establish that an accident caused the . . . death."

Several months later, on February 6, 2006, Hancock submitted a second appeal in which she enclosed a report from a forensic expert who had employed a "slip meter" to determine that there was a high risk of slipping on the type of flooring that V.D. Hancock had in her bathroom at the time of her death, especially if the bathroom floor had been wet. The expert noted that V.D. Hancock had a history of falling, had fallen one day prior to her death, and "it was clear that [V.D.] Hancock was very susceptible to falling down." The expert also noted that because V.D. Hancock was prone to bowel incontinence, the fact that she was found dead with her pants pulled down suggested that she was attempting to use the toilet; that "the position of the shower chair indicated that it had been knocked down, and may have been consistent with [her] . . . attempting to grab onto the chair as she was falling"; that the final resting position of V.D. Hancock's body "was consistent with a slip and fall event with her striking the back of her head on the toilet and/or on the floor"; that "it is possible that [V.D.] Hancock lost consciousness as a result of striking her head"; that V.D. Hancock's sleep apnea may have prevented her from sustaining her breathing while unconscious"; and that "published literature indicates that accidental fall events may result in death." The expert determined that

> In conclusion, although the Medical Examiner was not able to determine the exact cause of [V.D.] Hancock's death, it cannot be concluded that she did not die of accidental causes. In fact, based upon the available information, there was sufficient evidence to suggest that she was prone to falling down and that she probably did fall down in the bathroom. Based upon an analysis of the provided information in conjunction with [her] prior medical conditions, the potential exists that [V.D.] Hancock may have died as a result of an accidental fall in the bathroom. Due to the lack of evidence suggesting anything else to the contrary (including intoxication, natural causes, etc) in conjunction with the status of her reported medical conditions, a conclusion that [V.D.] Hancock's death appears to be related to an accidental fall appears to be reasonable.

In response to this second appeal, MetLife sent a letter to Hancock, indicating that it was willing to consider the appeal but that all submitted materials would be included in the administrative record. Hancock expressed her desire to continue with the second appeal.

In its initial assessment of Hancock's second appeal, MetLife noted the existence of evidence in the police report and the Chief Medical Examiner's report that many things could have caused V.D. Hancock's death. MetLife consulted with a physician, Dr. Stenger, who "advised that oxycodine may have been involved and that it[s] level of concentration in the body may have changed from 11/13 (date of death) to 11/18 (date she was found)."[1]

On September 13, 2006, MetLife informed Hancock, via letter, that it was upholding its earlier decision to deny accidental death benefits because the facts did not support Hancock's assertion that her mother's death resulted from an accident. MetLife noted the government's conclusion that V.D. Hancock's death was due to unidentifiable causes, and that there was no anatomic or toxicological abnormalities discovered during the autopsy sufficient to explain the

---

[1] There is no further explanation as to Dr. Stenger and his opinion in the record.

cause of death.  MetLife also stressed that

> The forensic consultant's report [did] not demonstrate with
> certainty that [V.D. Hancock] had an accident.  It addressed the
> 'slipmeter values' of [V.D. Hancock's] bathroom floor and
> hypothesizes that if the floor was wet, there would be a high
> probability of causing a slip, but one can only wonder as to what
> actually happened.  What is to dismiss the theory that [V.D.
> Hancock's] heart simply gave out, causing her to collapse?

Hancock filed for district court review of MetLife's benefit denial decision.

## DISCUSSION

There are three motions before the court.  First, Hancock moves for partial summary judgment, asserting that de novo review is the appropriate standard for the court to apply in considering MetLife's decision to deny Hancock accidental death benefits.  Second, MetLife moves for a bench trial on the papers.  Lastly, Hancock moves for full summary judgment. Because MetLife's Motion for Bench Trial on The Papers and Hancock's Motion for Summary Judgment are, despite their divergent captions, requests for essentially identical relief—i.e., both motions effectively ask the court to evaluate whether MetLife appropriately denied accidental benefits to Hancock— the court addresses these two motions concurrently.[2]

---

[2] In support of its Motion for a Bench Trial on The Papers, MetLife relies on a footnote in a recent Tenth Circuit case, in which the court noted that parties in ERISA benefit denial review cases should not move the district court for "judgment on the administrative record" because no such procedural mechanism exists and because it "often creates unnecessary work for an appellate court in deciding whether to construe such a motion *ex post* as one for a bench trial on the papers, or as one for summary judgment." *Jewell v. Life Ins. Co. of N. Am.*, 508 F.3d 1303, 1307 n.1 (10th Cir. 2007) (additional quotations and citations omitted).

Prior to the *Jewell* opinion, however, several district courts, relying on the Tenth Circuit decision *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560 (10th Cir. 1997), have
  held that the summary judgment standard is not the proper

I. **Motion for Partial Summary Judgment**

In her motion for partial summary judgment, Hancock contends that de novo review is appropriate because Utah Administrative Code rule 590-218 prohibits the Plan's reservation of discretion clause. *See* Utah Administrative Code R590-218. MetLife counters that even if rule 590-218 bars the Plan's discretionary clause, ERISA preempts the rule, thus rendering the rule's prohibition ineffectual.

As the parties are aware, this court recently decided that ERISA does in fact preempt rule 590-218. *See Weeks v. Unum Group*, 2008 WL 2224832, No. 2:07-cv-00577 (D. Utah May 27, 2008). Upon review of that decision, the court sees no need to revisit or revise its preemption analysis. Nevertheless, because Hancock devoted a significant amount of time at oral argument to her assertion that the court's earlier preemption analysis was erroneous because the court

---

standard when evaluating a denial of ERISA benefits under arbitrary and capricious review . . . [because in ERISA review cases] the court acts as an appellate court and evaluates the reasonableness of a plan administrator or fiduciary's decision based on the evidence contained in the administrative record.

*Panther v. Synthes (USA)*, 380 F. Supp. 2d 1198, 1207 n.9 (D. Kan. 2005). In *Olenhouse*, the court "explicitly prohibit[ed]" the use of summary judgment motions and procedures in cases seeking judicial review of administrative agency decisions, stating that such procedural posturing is, "at its core, . . . inconsistent with the standards of judicial review of agency action under the APA." 42 F.3d at 1579.

More recently, a Colorado District Court stated,
[w]ithout disparaging *Jewell's* notion that such matters will most commonly be resolved via "a bench trial on the papers," this [c]ourt finds that [the] notion of this [c]ourt sitting in an appellate capacity most closely fits the facts of this case, where the parties have not disputed the completeness of the [a]dministrative [r]ecord. Accordingly, this [c]ourt treats the case as presenting cross-appeals under Fed. R. App. P. 28.1.

*Sullivan v. Ltd. Brands, Inc. Long-Term Disability Prog.*, 2008 WL 659641, No. 06-cv-00918, at *1 (D. Colo. March 5, 2008).

8

overlooked the distinction between scope of review and standard of review, the court addresses

Hancock's contention of legal error.

Rule 590-218 prohibits reservation of discretion clauses in ERISA employee benefit

plans unless the discretionary clause

> has language that is the same as, or substantially similar to . . . [the following:]
>
> "Benefits under this plan will be paid only if (the plan administrator) decides in its discretion that (the claimant) is entitled to them.  (The plan administrator) also has discretion to determine eligibility for benefits and to interpret the terms and conditions of the benefit plan.  Determinations made by (the plan administrator) pursuant to this reservation of discretion to not prohibit or prevent a claimant from seeking judicial review in federal court of (the plan administrator's) determinations.
>
> The reservation of discretion made under this provision only establishes the scope of review that a federal court will apply when (a claimant) seeks judicial review of (the plan administrator's) determination of eligibility for benefits, the payment of benefits, or interpretation of the terms and conditions applicable to the benefit plan.
>
> (The plan administrator) is an insurance company that provides insurance to this benefit plan and the federal court will determine the level of discretion that it will accord (the plan administrator's) determinations."

Utah Admin. Code R590-218.  According to Hancock, because the rule requires discretionary

clauses to state that "[t]he reservation of discretion made under this provision *only* establishes

the *scope of review* that a federal court will apply" when a claimant seeks judicial review of a

denial decision, the rule effectively prohibits discretionary clauses that dictate the standard of

review the court applies in reviewing a benefits denial decision.  (Emphasis added.)  In other

words, rule 590-218 permits discretionary clauses that limit the scope of a court's inquiry—i.e.,

9

what evidentiary materials a court may consider—but proscribes discretionary clauses that attempt to limit a court's standard of review to anything less than de novo. Thus, Hancock claims that because the rule bars discretionary clauses from limiting a court's standard of review, the rule substantially affects the risk pooling arrangement between the insurer and the insured and is therefore saved from ERISA preemption. *See Kentucky Association of Health Plans, Inc. v. Miller*, 538 U.S. 329, 341-42 (2003) (holding that for a state law to be deemed a law which regulates insurance, and therefore saved from ERISA preemption, the state law must (1) "be specifically directed toward entities engaged in insurance" and (2) "substantially affect the risk pooling arrangement between the insurer and the insured").

Hancock is correct that this court has treated standard of review to mean the level of deference, if any, a court gives an ERISA plan administrator's decision, and scope of review as referring to what evidence, if any, may be considered by the reviewing court. *See Lund v. UNUM Life Ins. Co.*, 19 F. Supp. 2d 1254, 1257, 1259 (D. Utah 1998). But the court disagrees that rule 590-218 intended to make this substantive distinction between the two terms.

This court "interpret[s] state law according to state rules of statutory construction." *Ward v. Utah*, 398 F.3d 1239, 1248 (10th Cir. 2005). When deciding questions of statutory interpretation, Utah courts first look to the statute's plain language. *See In re Kunz*, 2004 UT 74, ¶ 8, 99 P.3d 793. In reviewing plain language, courts examine the "language, in relation to the [rule] as a whole, to determine its meaning." *Calhoun v. State Farm Mut. Auto. Ins. Co.*, 2004 UT 56, ¶ 18, 96 P.3d 916. "[E]ach part or section should be construed in connection with every other part or section so as to produce a harmonious whole." *State v. Maestas*, 2002 UT 123, ¶ 54, 63 P.3d 621 (quotations and citation omitted). The court avoids interpretations that would

render portions of the rule meaningless. *See LKL Assocs., Inc. v. Farley*, 2004 UT 51, ¶ 7, 94 P.3d 279. Only if the court determines that the plain language is "unreasonably confused, inoperable, or in blatant contravention of the express purpose of the statute" will it "seek guidance from the legislative history and relevant policy considerations." *Gohler v. Wood*, 919 P.2d 561, 562-63 (Utah 1996).

Here, the court first notes that, despite Hancock's assertions, a plain language reading of the rule does not axiomatically result in the terms standard of review and scope of review having two distinctive meanings. Utah cases do not necessarily distinguish between the two terms. *See, e.g., Utah Dep't of Admin. Servs. v. Pub. Serv. Comm'n*, 658 P.2d 601, 607 (Utah 1983) ("clarify[ing] [the court's] standard or scope of review of the various types of Commission decisions brought before us").

Second, to view the rule as a harmonious whole and to avoid rendering any part of the rule superfluous, scope of review and standard of review must be synonymous. That is, it is meaningless for the rule to state that "the federal court will determine *the level of discretion* that it will accord (the plan administrator's) determinations," if discretionary clauses do not establish an abuse of discretion standard of review. (Emphasis added.)

Finally, even assuming that the term scope of review could be interpreted as ambiguous, reading scope of review as distinguishable from standard of review does not make sense when considered in light of established ERISA law in effect at the time rule 590-218 was adopted. In *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989), the United States Supreme Court recognized that insurers could design ERISA plans to include language granting discretionary authority to a plan fiduciary, and if such discretionary authority existed, courts would review

benefits eligibility decisions for an abuse of discretion.  *See id*. at 115.  Although the Tenth Circuit has held that the amount of deference afforded by the reviewing court may differ depending on the circumstances of the case, "[t]he standard always remains arbitrary and capricious."  *Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1097 (10th Cir. 1999).  Reading rule 590-218's employment of the term scope of review as synonymous with standard of review reflects these principles in allowing for discretionary clauses, in ensuring that insurers know that such clauses do not prevent them from seeking judicial review of a benefits decision, and in acknowledging that under the abuse of discretion standard, the reviewing court still has the power to determine what level of discretion to afford denial determinations.  *See* Utah Admin. R590-218.

In sum, this court disagrees with Hancock's reading of rule 590-218, and, in accordance with the court's decision in *Weeks v. Unum Group*, 2008 WL 2224832, No. 2:07-cv-00577 (D. Utah May 27, 2008), denies Hancock's Motion for Partial Summary Judgment.

## II. MetLife's Motion for Bench Trial on The Papers and Hancock's Motion for Summary Judgment

In her Motion for Summary Judgment, Hancock argues that MetLife has failed to sustain its burdens of proof regarding its decision to deny her accidental death benefits.  Specifically, Hancock avers that MetLife has failed to prove that one of the Plan's exclusions apply and has neglected to show that its decision to deny benefits was reasonable.  In contrast, MetLife's Motion for Bench Trial on The Papers claims that the insurer's denial of benefits was reasonable and was based on substantial evidence in the administrative record.

**A.     Standard of Review**

"A denial of benefits challenged under § 1132 (a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).  If a plan does provide discretionary authority, the court reviews benefit determinations for an abuse of discretion.  *See Hall v. Unum Life Ins. Co. of Am.*, 300 F.3d 1197, 1200-01 (10th Cir. 2002).   In this case, the parties do not dispute that the Plan granted MetLife discretionary authority.

Under the abuse of discretion, or arbitrary and capricious, standard,[3] the denial "decision will be upheld unless it is not grounded on any reasonable basis." *Kimber v. Thiokol*, 196 F. 3d 1092, 1098 (10th Cir. 1999).   "The Administrator's decision need not be the only logical one or even the best one.  It need only be sufficiently supported by facts within his knowledge to counter a claim that it was arbitrary or capricious."  *Id*.  "Indicia of an arbitrary and capricious decision includes the lack of substantial evidence." *Caldwell v. Life Ins. Co. of N. Am.*, 287 F.3d 1276, 1282 (10th Cir. 2002).  "Substantial evidence is evidence that a reasonable mind might accept as adequate to support a conclusion." *Id*.  Substantiality is determined by looking at the record as a whole and "requires more than a scintilla but less than a preponderance." *Id*.  In reviewing MetLife's denial of accidental death benefits to Hancock under the arbitrary and capricious standard, the court is "'limited to the administrative record—the materials compiled by the administrator in the course of making his decision.'" *Fought v. Unum Life Ins. Co. of*

---

[3] The Tenth Circuit treats these terms as "interchangeable in this context." *Fought v. Unum Life Ins. Co. of Am.*, 379 F.3d 997, 1003 n.2 (10th Cir. 2004).

*Am.*, 379 F.3d 997, 1003 (10th Cir. 2004) (quoting *Hall*, 300 F.3d at 1201) (additional quotations omitted).

**B.     Burden of Proof**

Hancock contends that MetLife has failed to prove that a Plan exclusion applies and has neglected to demonstrate that its benefit denial decision was reasonable. Regarding the latter alleged failure, Hancock asserts that because a conflict of interest exists and a procedural irregularity occurred, the burden of proof shifted to MetLife to show that its decision was reasonable. In response, MetLife counters that it did not invoke an exclusion and therefore the burden remained with Hancock to show entitlement to benefits, and that no burden shifting resulted from a conflict of interest or procedural irregularity.

Regarding Hancock's first claim that MetLife failed to prove sufficient facts in support of a policy exclusion, the court recognizes the well-established law that it is the insurer's burden to "prove facts that bring a loss within an exclusionary clause of the policy." *McGee v. Equicor-Equitable HCA Corp.*, 953 F.2d 1192, 1205 (10th Cir. 1992). The court also understands, however, that "[i]t is a basic rule of insurance law that the insured carries the burden of showing a covered loss has occurred" that entitles the insured to benefits, and that this burden must be met before the burden shifts to the insurer to show that an exclusion applies. *Id*. MetLife contends, and the record reflects, that it did not invoke a policy exclusion. Hancock does not point the court to any evidence indicating that MetLife invoked a policy exclusion. Instead, Hancock claims that MetLife's decision to deny benefits constitutes an exclusion in itself. The court does not agree and thinks that such a decision would render exclusion clauses superfluous. Under Hancock's logic, an insurer would invoke an exclusion any time it denied benefits,

consequently eradicating an insured's burden to prove entitlement to benefits.

The court also disagrees with Hancock's contention that the burden of proof shifted to MetLife to prove the reasonableness of its decision because of serious procedural irregularities or because the company had an inherent conflict of interest due to its dual role as insurer and plan administrator. Hancock is correct that in *Fought v. Unum Life Insurance Co. of America*, 379 F.3d 997 (10th Cir. 2004), the Tenth Circuit Court of Appeals stated that if a plan administrator operates under an "inherent conflict of interest" or "when a serious procedural irregularity exists," the court decreases the amount of deference given the benefits decision, and "the plan administrator bears the burden of proving the reasonableness of its decision pursuant to this court's traditional arbitrary and capricious standard." *Id*. at 1006. The sliding-scale and burden-shifting approach explained by the court in *Fought* is, however, uncertain after the Supreme Court's recent decision in *Metropolitan Life Insurance Co. v. Glenn*, 128 S. Ct. 2343 (2008). In that case, the Court did recognize that an inherent conflict of interest exists when a professional insurance company also acts as the plan administrator. *See id*. at 2348. But the Court further stated that this conflict "should 'be weighed as a factor in determining whether there is an abuse of discretion.'" *Id*. at 2350 (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)) (additional quotations and citation omitted). Although the Tenth Circuit has yet to opine on how the *Glenn* decision correlates to the circuit's well-established sliding scale approach to conflicts of interest, the *Glenn* decision does expressly reject the notion, promulgated by Hancock, that when an inherent conflict of interest exists, the burden shifts to the insurer to prove the reasonableness of its decision. *See id*. (stating that the Court did not "believe it necessary or desirable for courts to create special burden-of-proof rules, or other

special procedural or evidentiary rules, focused narrowly on the evaluator/payor conflict" when evaluating benefit denials).

The court is aware that the *Glenn* decision did not involve or discuss how courts should evaluate serious procedural irregularities. But the court need not reach the issue because it concludes that MetLife's failure to hire an independent investigator to determine the cause of V.D. Hancock's death did not, under the circumstances present here, constitute a serious procedural irregularity. Here, the Chief Medical Examiner conducted an autopsy and concluded that V.D. Hancock died of "undetermined causes." Because the medical examiner, an undisputed independent evaluator, did not conclude V.D. Hancock's death was accidental, and Hancock's expert suggested only that the potential existed that V.D. Hancock's death was an accident, the court declines to hold that a serious procedural irregularity occurred in MetLife's failure to hire its own independent expert.

### C.     Denial of Benefits Decision

Upon review of the administrative record, particularly the reports provided by the police, the medical examiner, and Hancock's expert, the court holds that MetLife's decision to deny benefits was not unreasonable and was not without substantial evidentiary support. Although Hancock argues that her expert wholeheartedly opined that V.D. Hancock slipped and fell and that any injuries resulting from this fall were the sole cause of her death, this is not an accurate summarization of the expert's report. In his report, Hancock's expert suggested that if the floor had been wet, there was a high risk for a slip and fall. Whether or not the floor was wet is speculative since any water could have evaporated by the time Hancock and the police arrived.

Hancock's expert report also consistently states that various things *may* have happened and that it was not unreasonable to conclude that V.D. Hancock died of a slip and fall. In short, the expert report does not state that a slip and fall did occur. Nor does the expert report show that even if a slip and fall had occurred, it was the sole cause of V.D. Hancock's death. In fact, the expert notes that if she had been knocked unconscious by the fall, V.D. Hancock's sleep apnea may have caused her to stop breathing.

In sum, because the medical examiner ascertained that V.D. Hancock died of undetermined causes, and the record indicates that any suggestion by others as to how she died was speculative, the court concludes that it was not arbitrary and capricious for MetLife to determine, as required under the Plan, that an accident was not the sole cause of injury or the injury was not the sole cause of V.D. Hancock's death. The court therefore affirms MetLife's decision to deny accidental death benefits to Hancock.

## CONCLUSION

For the foregoing reasons, the court DENIES Hancock's Motions for Full and Partial Summary Judgment. The court GRANTS MetLife's Motion for Bench Trial on The Papers, thus affirming MetLife's decision to deny accidental death benefits. The court dismisses Hancock's claims with prejudice and orders each party to bear their own costs.

DATED this 1st day of August, 2008.

BY THE COURT:

_Dale A. Kimball_

                                            DALE A. KIMBALL

                                            United States District Judge